UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

FNU BRUNHILDA,                                        Case No. 21-CV-1299 (PJS/DJF)

                          Plaintiff,

v.                                                                        ORDER

PURDUE UNIVERSITY GLOBAL and
INDIANA COMMISSION FOR HIGHER
EDUCATION,

                          Defendants.

---

Fnu Brunhilda, pro se.

Evan Kennedy, John R. Maley, and Christopher L. Lynch, BARNES &
THORNBURG LLP, for defendant Purdue University Global.

Plaintiff Fnu Brunhilda, a former student at defendant Purdue University Global

("Purdue"), brought this action arising out of her dismissal from the school's online

master's program in nursing.[1]  This matter is before the Court on Purdue's motion for

summary judgment.  For the reasons that follow, Purdue's motion is granted in (large)

part and denied in (small) part.  Specifically, the motion is denied as to Brunhilda's

breach-of-contract claim insofar as that claim alleges a breach of Purdue's promise to

help her find a clinical site.  The motion is granted in all other respects.

---

[1]Brunhilda also sued the Indiana Commission for Higher Education.  The Court
granted the Commission's motion to dismiss all claims against it for lack of personal
and subject-matter jurisdiction.  ECF No. 84.

I.  BACKGROUND

Brunhilda enrolled in Purdue's nursing program in February 2020, with classes

starting the following month.  Brunhilda Dep. 40–42; Page Decl. ¶¶ 13–14 & Ex. 1.  The

nursing program requires students to complete a minimum number of clinical hours

under the supervision of a preceptor.  Page Decl. ¶ 8.  During Brunhilda's initial

communications with Purdue in January 2020, a Purdue enrollment specialist told her

that Purdue "will find a suitable preceptor on your behalf" and that "Purdue Global

and the chosen facility will secure an affiliation agreement."  ECF No. 118-19; Brunhilda

Dep. 59–60, 64–70.  This promise was a factor in Brunhilda choosing to attend Purdue.

Brunhilda Dep. 65.  The same enrollment specialist also told Brunhilda that she would

get a tuition discount if she started classes in March 2020.  Brunhilda Dep. 97–99.

On February 18, 2020, Brunhilda signed a number of enrollment documents,

including (1) an Enrollment Agreement, Page Decl. Ex. 1; and (2) a Nurse Practitioner

Disclosure Statement, ECF No. 110-2 at 53.  The Disclosure Statement requires

prospective students to initial a series of disclosures, including the following:

"I understand that this program requires several hundred hours of clinical experience

and that I am responsible for working with the University's clinical placement team in

locating appropriate sites for these experiences."  ECF No. 110-2 at 53.  Brunhilda

initialed all the statements on the form.  *Id.*  The Enrollment Agreement includes an

integration clause stating that "[t]his Agreement, its Addenda, and its attachments constitute the complete agreement between Purdue Global and the student, and no verbal statements or promises will be recognized or enforced."  Page Decl. Ex. 1 at 5.

Before enrolling at Purdue, Brunhilda also received a copy of Purdue's Student Clinical Handbook.  ECF No. 110-2 at 63–84; Brunhilda Dep. 51–52.  The Clinical Handbook states that "[y]ou are expected to begin the clinical placement process at the time of your enrollment" and "[i]t is your responsibility to identify and network with potential clinical sites and preceptors in your area that are appropriate for your clinical courses."  ECF No. 110-2 at 66.  The Handbook also states that "[t]he University will provide support and assistance to you in facilitation of your placement."  ECF No. 110-2 at 66.  To obtain Purdue's assistance, the Handbook instructs students to "reach out to the Clinical Placement Team for support and assistance" through the University's online clinical management system.  ECF No. 110-2 at 66.  The Handbook further provides that "[p]receptors are responsible for verifying clinical hours" and that "'Direct Patient Care Clinical Hours' refers to hours in which direct clinical care is provided to patients."  ECF No. 110-2 at 71; *see also* Brunhilda Dep. 76.

Brunhilda began classes at Purdue in March 2020.  Brunhilda Dep. 34, 40.  In the fall of that year, she took a class that required clinical hours.  Brunhilda Dep. 78–79; ECF

No. 18 at 3.[2]  Purdue claims that Brunhilda failed to submit the required "clinical

interest form" to get Purdue's assistance in locating a preceptor.  Page Decl. ¶¶ 18–19.

Brunhilda disagrees, contending that she did in fact submit the appropriate form,

repeatedly complained to Purdue about lack of assistance, and, in August 2020,

received an email from Purdue stating that the school would no longer assist students

in locating clinical sites.[3]  ECF No. 118 at 3, 12; Brunhilda Dep. 134; ECF No. 118-16.

Acting on her own, Brunhilda located two preceptors, including Dr. Florence Fon.

Brunhilda Dep. 70–72, 77–79.  Brunhilda located Fon through a former coworker, Dr.

Ivo Ditah, who was also Fon's mentor.  Brunhilda Dep. 71, 80–81.

Brunhilda worked at Fon's clinic for about three weeks, from November 11 to

December 4, 2020.  ECF No. 118-20 ¶ 2.  Several times over the course of the term,

Brunhilda informed the professor, Dr. Alexis Hanson, that she was not having a good

experience with Fon.  Brunhilda Dep. 86–87, 137–38.  At oral argument, Brunhilda

---

[2]Recognizing that Brunhilda is proceeding pro se, the Court gave her the
opportunity at the hearing to swear that the factual assertions in her brief are true,
which she did.

[3]Although Brunhilda claimed at oral argument that a copy of this email is in the
record, the Court was unable to locate it.  Notably, in an email exchange with a clinical
coordinator from early October 2020, Brunhilda expressed the wish that "the school was
doing more to help."  ECF No. 118-16 at 3.  The coordinator asked Brunhilda what
assistance she needed and told Brunhilda that "[w]e are happy to assist within the
confines of our policies and procedures that all students receive."  ECF No. 118-16 at 2.

clarified that she did not provide any details about her experience with Fon to anyone at Purdue until a December 22 phone call with Hanson (discussed below).

In mid-December, Fon contacted Hanson to request a phone conference. ECF No. 110-2 at 87. After speaking with Fon, Hanson asked Brunhilda to schedule a phone conference with Hanson to discuss "serious allegations" that Fon had made against her. Brunhilda Dep. 88, 92–93. Hanson and Brunhilda spoke on December 22. During that conversation, Hanson told Brunhilda that Fon had accused her of claiming to have worked hours during times when the clinic was closed and improperly asking Fon's administrative assistant (instead of Fon) to approve her hours.[4] Brunhilda Dep. 92–93; ECF No. 118 at 19. Brunhilda "explained and denied" the allegations. ECF No. 110-2 at 109; Brunhilda Dep. 86, 91–92. Specifically, Brunhilda explained that she mistakenly believed that she could claim hours for work she performed while the clinic was closed

---

[4]Brunhilda's deposition testimony is somewhat inconsistent concerning whether, during the December 22 discussion, Hanson told her about Fon's allegations. Brunhilda Dep. 86, 88–95, 101, 127–28. Eventually, Brunhilda admitted that the allegations were one of the subjects discussed during the December 22 call. Brunhilda Dep. 91–95, 101. That admission accords with Brunhilda's February 2021 complaint to the Indiana Commission for Higher Education, in which Brunhilda alleged that, during the December 22 call, she "explained and denied" Fon's accusation that Brunhilda had claimed unauthorized hours. ECF No. 110-2 at 109. At oral argument, Brunhilda clarified that Hanson told her, during the December 22 call, both that Fon was upset that Brunhilda had the assistant approve her hours and that Fon had accused her of claiming hours for times when the clinic was closed. Brunhilda also clarified that, during the same call, she explained to Hanson that Fon had told her to submit hours to her assistant and that Brunhilda thought that she could claim hours for work she performed while the clinic was closed.

and that Fon had directed her to have the assistant approve her hours.  ECF No. 118 at 10–11, 18.

During the December 22 conference, Brunhilda also made complaints about Fon. Brunhilda Dep. 86.  Specifically, Brunhilda told Hanson that Fon yelled at her, told her that she was too slow and not good enough, said that if she did not improve she'd be "out of here" because Fon was only doing a favor for a friend, and implied that she was conceited about her appearance.  Brunhilda Dep. 137.  At oral argument, Brunhilda clarified that this was the first time she provided these details to anyone at Purdue.

After the phone call with Hanson, Brunhilda contacted Ditah, the former coworker who had helped arrange her placement with Fon.  ECF No. 118-2 at 20.  Ditah spoke with Fon and relayed to Brunhilda that Fon wanted a written explanation and apology.  ECF No. 118-2 at 20, 73; Brunhilda Dep. 96–97.  Accordingly, Brunhilda emailed Fon on December 25 to thank her for her support and "apologize for any concerns and misunderstanding during our communication especially on clinical hours and confirmations."  ECF No. 110-2 at 114; ECF No. 118-17.  The email also provided a full list of the dates and times of clinical hours that Brunhilda claimed and offered to "come in and have more hours done."  ECF No. 118-17.

Over the next several weeks, at Hanson's suggestion, Brunhilda made additional attempts to communicate with Fon.  ECF No. 118-2 at 20; Brunhilda Dep. 143–44.

Brunhilda texted Fon on December 29 to follow up on her December 25 email and asked Fon to call her.  ECF No. 118-24 at 3.  On January 4, Brunhilda traveled to Minnesota and went to Fon's office.  ECF No. 118-24 at 5.  Fon refused to see her, but provided Brunhilda a paper copy of Brunhilda's December 25 email on which Fon had written a response that accused Brunhilda of lying and instructed Brunhilda that, if she wanted to see Fon, she would need to make an appointment.  Brunhilda Dep. 143–44; ECF No. 118-24 at 5–6; ECF No. 118 at 20.  Brunhilda scheduled an appointment for January 12.  ECF No. 118 at 20.  On January 6, Brunhilda texted Fon, "begging" her to "please devise a resolution."  ECF No. 118-24 at 4.  Meanwhile, Fon's administrative assistant called Brunhilda to cancel the January 12 appointment because, in Brunhilda's words, Fon "said she has reached out to the instructor Dr. Hanson and approved what was needed to be approved per her and everything was good to go."[5]  ECF No. 118 at 21; ECF No. 118-2 at 22–23.

Following this cancellation, however, Ditah contacted Brunhilda and told Brunhilda that Fon was now accusing her of hacking into the clinic's system to confirm her own hours and noting other discrepancies with her clinical hours.  ECF No. 118-2 at 22.  On January 7, Fon texted Brunhilda that she had approved the days that she

---

[5]The timing of this phone call is unclear, but a January 29, 2021, letter from Brunhilda to Purdue indicates that it was before Fon's final text to her, which was sent on January 7.  ECF No. 118-2 at 22–23.

knew Brunhilda worked in the clinic, accused Brunhilda of infiltrating her computer system to falsify records, and told Brunhilda not to contact her directly ever again.  ECF No. 118-24 at 7–9.  Fon also stated that, if she did not get satisfactory answers from Purdue about the alleged infiltration, Fon would report Brunhilda to the Board of Nursing and possibly law enforcement.  ECF No. 118-24 at 8.

Meanwhile, in late December and early January, Fon and Hanson had numerous phone calls and email exchanges during which Fon provided additional details and evidence to support her allegation that Brunhilda had falsified clinical hours.  *See* ECF No. 110-2 at 88–93, 97–108, 112–43.  Following these discussions, Hanson reported the issue to administrators Aaron Page and Michele McMahon on January 14, 2021.  ECF No. 110-2 at 94.

About a week later, on January 20, Page contacted Brunhilda to notify her that "[a] situation has come to my attention which causes concern in regards to the University's code of student conduct."  ECF No. 110-2 at 144.  Page requested a phone conference with Brunhilda and Hanson for the following day.  ECF No. 110-2 at 114.  Brunhilda anticipated that the conference would be about Fon's accusation that Brunhilda had falsified clinical hours.  Brunhilda Dep. 112–14, 128–29.

The phone conference took place on January 21.  Brunhilda Dep. 113–14.  The call was brief, did not go into much detail about Fon's allegations, and mostly consisted of

Page and Hanson posing questions to Brunhilda.  Brunhilda Dep. 114, 129; ECF No. 118 at 14; ECF No. 118-2 at 23–24.  Brunhilda was aware that Fon had accused her of falsifying clinical hours, however, and she denied the allegation and explained why it was false.[6]  Brunhilda Dep. 113–15, 127, 129–30.  Brunhilda was told that she would receive a response within a week, but was not told what type of response to expect.  Brunhilda Dep. 115.

One week later, on January 28, Brunhilda was notified by email that she was dismissed from Purdue for violating the school's Code of Student Conduct.  Brunhilda Dep. 116; ECF No. 110-2 at 146–47.  The email noted that she had logged hours and recorded patient encounters on days when the clinic was either not open or not seeing patients and that she had asked a clinic staff member to approve her hours without the preceptor's knowledge.  ECF No. 110-2 at 146.

The day after receiving the dismissal email, Brunhilda submitted an appeal to Purdue's Student Relations office.  ECF No. 110-2 at 111; Brunhilda Dep. 118.  The appeal form states that "[y]ou may attach any records, additional statements, or notes you see fit to clarify your position."  ECF No. 110-2 at 111.  After reviewing the

---

[6]As with her account of the December 22 phone call, Brunhilda's account of the January 21 phone call is inconsistent.  At her deposition, she testified that she denied the allegation and explained why it was incorrect.  Brunhilda Dep. 114–15, 129–30.  In her brief and at oral argument, however, she contended that she was not given a chance to tell her side of the story.  ECF 118 at 14, 22; Brunhilda Dep. 113–115, 127, 129–30; ECF No. 118-2 at 23–24.

evidence, Student Relations issued a short written decision upholding Brunhilda's dismissal.  ECF No. 110-2 at 149–50; Brunhilda Dep. 118–19.  The decision explained that Purdue's Clinical Handbook defines clinical hours as the hours spent providing direct clinical care to patients and requires that the preceptor verify clinical hours.  ECF No. 110-2 at 149; *see also* ECF No. 110-2 at 71 (Clinical Handbook); Brunhilda Dep. 76.

Brunhilda next submitted a complaint to the Indiana Commission for Higher Education.  ECF No. 110-2 at 109–10; Brunhilda Dep. 119.  The Commission rejected the appeal, stating that it would not get involved.  Brunhilda Dep. 119.  Meanwhile, Brunhilda retained an attorney, who contacted Purdue.  Brunhilda Dep. 120.  Through counsel, Brunhilda submitted numerous additional materials, including an affidavit and a chart responding to Fon's allegations, a lengthy letter from her counsel explaining her side of the story, and multiple letters from third parties attesting to her character.  Brunhilda Dep. 121, 131; ECF No. 118-2 at 30–42, 48–49, 60–79.  Purdue's counsel responded that he had discussed Brunhilda's submissions with school officials and that Purdue would not reverse its decision.  ECF No. 118-2 at 54; Brunhilda Dep. 121.  This lawsuit followed.

## II.  ANALYSIS

### A.  *Standard of Review*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Id.* at 255.

### B.  *Due Process*[7]

Brunhilda contends that Purdue violated her Fourteenth Amendment right to due process when it dismissed her from the nursing program.  Before dismissing a student for disciplinary reasons, a public educational institution must provide notice of the charges and, if the student denies the charges, an explanation of the evidence and an

---

[7]The Court previously dismissed all of Brunhilda's claims save for (1) a procedural due-process claim; (2) a negligence claim; (3) a breach-of-contract claim based on the failure to provide a tuition discount; and (4) a breach-of-contract claim based on the failure to provide a clinical site.  ECF No. 84.  The Court therefore does not address any other claims that Brunhilda mentions in her brief, as they are not properly before the Court.

opportunity to respond.[8]  *Keefe v. Adams*, 840 F.3d 523, 534–35 (8th Cir. 2016).  Where

additional post-removal procedures are available, however, "the due process requisites

for the pre-removal hearing 'can vary, depending upon . . . the nature of the subsequent

proceedings.'"  *Id.* at 535 (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545

(1985)).

The record in this case discloses that Brunhilda received all of the process that

she was due.  First, during the December 22 phone call, she was informed of Fon's

allegations against her and given an opportunity to respond.  *Id.* ("Due process does not

require a delay between the 'notice' and the 'opportunity to respond.'" (citation and

quotation marks omitted)).  Following further investigation by Purdue, school officials

again spoke to Brunhilda about the allegations on January 21.  As noted, Brunhilda's

account of this phone call is somewhat inconsistent; in her deposition she testified that

---

[8]The procedural requirements for academic dismissals are "far less stringent" than those for disciplinary dismissals.  *Bd. of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86 (1978).  Depending on the facts of the case, however, it may be difficult to determine which standard should apply.  *See Keefe v. Adams*, 840 F.3d 523, 535 (8th Cir. 2016) ("[w]hen conduct that leads to an adverse academic decision is of a disciplinary nature, due process *may* require the procedural protections" attendant on disciplinary dismissals); *Monroe v. Ark. State Univ.*, 495 F.3d 591, 595 (8th Cir. 2007) ("courts have considered dismissals 'academic' in similar scenarios when the student's deficiencies, while arguably warranting disciplinary action, also bear on academic performance"); *cf. Corso v. Creighton Univ.*, 731 F.2d 529, 532 (8th Cir. 1984) (in breach-of-contract case, cheating on a test and then lying about it was an academic offense for purposes of determining which contractual procedures applied).  This case at least arguably involves an academic dismissal, but Purdue analyzes Brunhilda's due-process claim under the standard applicable to disciplinary dismissals, so the Court does likewise.

she denied the allegations and explained why they were incorrect, Brunhilda Dep. 115, 129–30, but in her brief and at oral argument she contended that she was not given a chance to tell her side of the story, ECF No. 118 at 14.  Even treating the latter contention as true, Brunhilda had already been given an opportunity to respond during the December 22 phone call.  Moreover, Brunhilda was afforded two rounds of appeals in which to contest her dismissal, both of which included the opportunity to submit additional materials.[9]  Brunhilda Dep. 121, 131, 133; ECF No. 110-2 at 111; ECF No. 118-2 at 30–42, 48–49, 60–79.

Brunhilda contends that she was essentially sandbagged by the January 21 phone call because she thought that her issues with Fon had been resolved.  As noted earlier, however, Brunhilda admitted that, when the phone call was scheduled, she anticipated that it would be about Fon's accusations—which makes sense, given that, in early January, Brunhilda was still desperately trying to contact Fon and their last contact involved Fon again accusing Brunhilda of falsifying records, telling Brunhilda not to contact her directly ever again, and warning her that she would be reported to the Board of Nursing and possibly law enforcement.

---

[9]It is true, as Brunhilda points out, *see* ECF No. 118 at 4, that Purdue's normal process provided for only one level of appeal.  As a factual matter, however, Purdue entertained her second request to reconsider her dismissal.  ECF No. 118-2 at 54 (email from Purdue's counsel stating that he had discussed Brunhilda's submissions with the school's nursing and university leadership and that Purdue had decided not to reverse the dismissal).

Moreover, Brunhilda was told that the January 21 phone call would be about a "situation . . . which causes concern in regards to the University's code of student conduct."  ECF No. 110-2 at 144.  Similar high-level descriptions have been found to provide adequate notice.  *See Keefe*, 840 F.3d at 535 (noting that "the notion that Keefe had inadequate notice of what the meeting would concern does not withstand scrutiny" because Keefe was told that the meeting concerned professional boundaries and he clearly interpreted that to mean that his classmates had complained about him).  And even if Brunhilda had not been provided advance notice, due process does not require a delay between the notice and the opportunity to respond.  *Id.*  Brunhilda's claim of lack of notice is without merit.

Brunhilda also contends that Purdue failed to conduct an adequate investigation and failed to turn over copies of emails between Fon and Hanson until the discovery phase of this federal litigation.  In this context, however, due process does not require a formal adversarial proceeding.  *Id.* at 536–37 (due process requires only an "'informal give-and-take' between the student and the administrative body" (quoting *Horowitz*, 435 U.S. at 85–86)).  More importantly, Brunhilda does not deny either that she had the clinic's administrative assistant approve her hours or that she claimed hours for time that did not involve direct patient contact.[10]  ECF No. 118 at 10–11.  While Brunhilda

---

[10]In her brief, Brunhilda argues that the assistant should have known to submit

(continued...)

claimed that these were innocent mistakes and that Fon directed her to submit her hours to the assistant, these disputes are ultimately irrelevant.  As the Student Relations Office explained in rejecting Brunhilda's appeal, this conduct violated Purdue's Clinical Handbook and, by claiming hours that did not qualify under the Handbook, Brunhilda violated the Code of Student Conduct's prohibition on dishonesty.  ECF No. 110-2 at 149–50; *cf. Keefe*, 840 F.3d at 535 (finding student was given sufficient due process where there were no material factual disputes and he was given an opportunity to respond).

Finally, Brunhilda contends that Page and Hanson, the decisionmakers and participants in the January 21 phone call, were biased against her.  According to Brunhilda, Page was biased because he previously had to deal with Brunhilda's various complaints about the program.  ECF No. 118 at 6–7.  As for Hanson, Brunhilda contends that she demonstrated bias by failing to communicate with Brunhilda or take timely action to resolve the dispute with Fon.  ECF No. 118 at 11.

---

[10](...continued)
the hours to Fon for confirmation or otherwise check with Fon, ECF No. 118 at 10–11, implying that, for all Brunhilda knew, that is in fact what the assistant did.  The record demonstrates otherwise, however.  A text exchange between Brunhilda and the assistant shows Brunhilda asking the assistant why the *assistant* had denied certain hours and reminding the *assistant* to confirm the hours.  ECF No. 110-2 at 122–26; ECF No. 118-2 at 99–100; Brunhilda Dep. 104–107.  Moreover, elsewhere in her brief, Brunhilda indicates that she knew that the assistant was confirming her hours.  ECF No. 118 at 16–18.

Such conclusory allegations are insufficient to show actual bias. *See Richmond v. Fowlkes*, 228 F.3d 854, 858 (8th Cir. 2000) ("Where administrative matters are concerned we must proceed on the assumption that the administrators are entitled to a presumption of honesty and integrity unless actual bias, such as personal animosity, illegal prejudice, or a personal or financial stake in the outcome can be proven." (citation and quotation marks omitted)). Setting that aside, Brunhilda's appeal was heard by a separate office at Purdue, and that dispelled any potential bias. *Sutton v. Bailey*, 702 F.3d 444, 449 (8th Cir. 2012) ("An impartial decisionmaker is not required at the pre-termination stage so long as the employee has access to post-termination proceedings before an impartial adjudicator."). The Court therefore grants Purdue's motion for summary judgment on Brunhilda's due-process claim.

### C.  Negligence

Brunhilda alleges that Purdue acted negligently in failing to protect her from Fon's alleged bullying and harassment. As Purdue correctly argues, this claim fails as a matter of law for at least two reasons:

*First*, Purdue did not owe Brunhilda a duty of care. "Minnesota law follows the general common law rule that a person does not owe a duty of care to another—e.g., to aid, protect, or warn that person—if the harm is caused by a third party's conduct." *Doe 169 v. Brandon*, 845 N.W.2d 174, 177–78 (Minn. 2014). There are two exceptions to this

rule: (1) "when there is a special relationship between a plaintiff and a defendant and the harm to the plaintiff is foreseeable," and (2) when the defendant's own active misconduct creates a foreseeable risk of injury to a foreseeable plaintiff.  *Id.* at 178.

Neither of these exceptions are applicable because, among other things, there is no evidence that any risk of harm was foreseeable.  Brunhilda admitted at oral argument that, during her clinical placement, she made only generic remarks to the effect that she was not having a good experience, and she did not provide Purdue any details about the alleged harassment until after the placement ended.  Nor is there any other evidence that Purdue was on notice that Fon might harass a student working in her clinic.  Fon's alleged harassment was therefore unforeseeable as a matter of law.  *Smits as Tr. for Short v. Park Nicollet Health Servs.*, 979 N.W.2d 436, 458–60 (Minn. 2022) (healthcare providers owed no duty of care to patient's family where patient had no history of violence and showed no warning signs that he would harm his family); *Griffin v. Pinkerton's, Inc.*, 173 F.3d 661, 665 (8th Cir. 1999) ("Griffin's failure to show Pinkerton had actual or constructive notice of inappropriate conduct by its employees is fatal to both the negligent supervision and negligent retention claims.").

*Second*, even if Purdue owed Brunhilda a duty of care, Brunhilda's alleged damages—emotional distress and resulting physical symptoms—are not recoverable.

In tort cases, emotional distress may be an element of damages in only three circumstances.  First, a plaintiff who

suffers a physical injury as a result of another's negligence
may recover for the accompanying mental anguish.
*Langeland v. Farmers State Bank of Trimont*, 319 N.W.2d 26, 31
(Minn. 1982).  Second, a plaintiff may recover for negligent
infliction of emotional distress when physical symptoms
arise after and because of emotional distress, if the plaintiff
was actually exposed to physical harm as a result of the
negligence of another (the "zone-of-danger" rule).  *K.A.C.*,
527 N.W.2d at 559; *Langeland*, 319 N.W.2d at 31; *Stadler v.
Cross*, 295 N.W.2d 552, 554 (Minn. 1980).  Finally, a plaintiff
may recover emotional distress damages when there has
been a "direct invasion of the plaintiff's rights such as that
constituting slander, libel, malicious prosecution, seduction,
or other like willful, wanton, or malicious conduct." *State
Farm Mut. Auto. Ins. Co. v. Village of Isle*, 265 Minn. 360, 368,
122 N.W.2d 36, 41 (1963).

*Lickteig v. Alderson, Ondov, Leonard & Sween, P.A.*, 556 N.W.2d 557, 560 (Minn. 1996).

None of these circumstances are present in this case.  Brunhilda does not allege
that the negligence caused her any physical injury.  Nor does she claim that she was
ever within a "zone of danger" for physical harm.  Finally, she is alleging negligence,
not willful, wanton, or malicious conduct.  *See id.* (explaining that, "in the 'willful
conduct' category, emotional distress is. . . an element of the damages arising from an
intentional tort that constitutes a direct violation of the plaintiff's rights").  The Court
therefore grants Purdue's motion for summary judgment on this claim.

*D.  Breach of Contract*[11]

1.  Discount

Brunhilda alleges that an enrollment specialist promised her a tuition discount.

At oral argument, however, Brunhilda conceded that she signed the Enrollment

Agreement after the enrollment specialist made this alleged promise.  The Enrollment

Agreement states that "[t]he tuition and fees for your program are included in the

Tuition and Fees Supplement" and includes a link to that document.  Page Decl. Ex. 1

at 2.  As noted, the Enrollment Agreement also contains an integration clause.  Page

Decl. Ex. 1 at 5.

Brunhilda does not contend that she was charged more than the tuition and fees

incorporated into the Enrollment Agreement.  Instead, she relies solely on the earlier

promise of a discount.  Because the Enrollment Agreement is an integrated contract, the

earlier promise is not admissible to contradict it.  *Qwinstar Corp. v. Anthony*, 882 F.3d

748, 753 (8th Cir. 2018) (under Minnesota law, "parol evidence of any prior agreement is

---

[11]Brunhilda contends that Purdue failed to follow its own progressive-discipline policy for academic dishonesty and that it also failed to follow its policy to provide notice and an opportunity to respond to allegations of dishonesty.  These claims are not properly before the Court, however.  And even if they were, the Court would dismiss them as meritless.  As discussed above, Brunhilda was given both notice and an opportunity to respond, and Purdue's progressive-discipline policy warns that the process that it describes "may not be adhered to, depending on the circumstances of the infraction."  ECF No. 110-2 at 62; *cf. Ewald v. Wal-Mart Stores, Inc.*, 139 F.3d 619, 622 (8th Cir. 1998) (employee's breach-of-contract claim failed where handbook stated that there was no guarantee of any certain disciplinary procedures).

inadmissible where the agreement is unambiguous and completely integrated" (cleaned up)).  The Court therefore grants Purdue's motion for summary judgment on this claim.

2.  Clinical Site

Finally, Brunhilda alleges that Purdue breached its promise to help her find a clinical site.  Brunhilda cites the enrollment specialist's statement that Purdue "will find a suitable preceptor on your behalf" and that "Purdue Global and the chosen facility will secure an affiliation agreement."  ECF No. 118-19.  Again, however, because the Enrollment Agreement is an integrated contract, this parol evidence is inadmissible. *Qwinstar Corp.*, 882 F.3d at 753.  The Court therefore grants summary judgment to Purdue on this breach-of-contract claim to the extent that the claim rests on these statements.

As discussed above, however, the Clinical Handbook states that Purdue "will provide support and assistance to you in facilitation of your placement."  ECF No. 110-2 at 66.  Purdue contends that Brunhilda failed to submit a request for help through Purdue's online system and, as a result, Purdue was not required to assist her.  But Brunhilda contends that she did submit such a request using the appropriate form.  ECF No. 118 at 12.  As there is a factual dispute, the Court cannot grant summary judgment on Brunhilda's claim that Purdue breached the Handbook's promise that Purdue would help her find a clinical site.

That said, the Court notes that there is at least one (likely) fatal problem with this claim:  There do not appear to be any recoverable damages for this alleged breach, as Brunhilda found a preceptor on her own and was able to begin her clinical coursework without any delay.  Brunhilda Dep. 71, 80, 134.  Brunhilda may claim that, had Purdue helped her, she would have been paired with a better preceptor, and with that better preceptor, Bruhilda would have successfully completed her studies.  But this theory of damages seems too speculative to support an award of damages or any other relief. *Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn. 1977) ("damages which are speculative, remote, or conjectural are not recoverable" (citation and quotation marks omitted)); *DeRosier v. Util. Sys. of Am., Inc.*, 780 N.W.2d 1, 4–5 (Minn. Ct. App. 2010) (in breach-of-contract actions, consequential damages "are not recoverable unless they are reasonably foreseeable to the parties at the time of the breach"); *see also Lickteig*, 556 N.W.2d at 561 ("In general, extra-contractual damages, including those for emotional distress, are not recoverable for breach of contract except in those rare cases where the breach is accompanied by an independent tort.").  Given that Purdue did not move for summary judgment on this ground, however, the Court will not address it further.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

-21-

1.   Defendant's motion for summary judgment [ECF No. 107] is GRANTED
     IN PART and DENIED IN PART.

2.   The motion is DENIED as to plaintiff's claim that defendant breached its
     contractual duty to assist her in finding a clinical preceptor.

3.   The motion is GRANTED in all other respects, and all other remaining
     claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.


Dated:  May 30, 2023                         s/Patrick J. Schiltz
                                             Patrick J. Schiltz, Chief Judge
                                             United States District Court